CHOCTAW, O. & G. R. CO. VS BOND.

Opinion rendered November 24, 1906.

(98 S. W. Rep. 335).

1. *Contracts—Performance—Recovery On.*

Plaintiff sold to defendant railroad company improvements on tribal lands, to which there were other claimants, for the purpose of building a reservoir. Plaintiff agreed to procure leases on said land from the Indian holder. There was also sold by plaintiff to said defendant certain city property and by said agreement the railroad company was to retain part of the purchase price until the completion of the dam without interruption. Plaintiff fully complied with his part of the contract. Thereafter and upon the passage of the Act of Congress of February 28, 1902, C. 134 (32 Stat. 43 [U. S. Comp. St. Supp. 1903, p 370]), the railroad, by right created by said act condemned said tribal lands. *Held*, That when the contract was executed, the act authorizing condemnation proceedings had not been enacted. No titles in fee could be secured, the Indian was not authorized to convey title in fee, and the right to occupancy could alone be conveyed. The plaintiff having fully complied with the contract, should recover the amount of money retained.

2. *Tribal Lands—Leases.*

> The Act of June 28, 1898 (30 Stat. 495, C. 517, Sec. 16) provides that where a citizen shall be in possession of only such an amount of agricultural or grazing land as would be his just and reasonable share of the lands of his Nation and that to which his wife and minor child are entitled, he may continue to use and rent same until allotment time. *Held;* The allotment of land did not take place until after the ratification of the supplemental agreement approved July 1, 1902 (32 Stat. 641) and said citizen could make a valid lease "until allotment had been made to him."

3. *Railroads—What Lands May be Acquired by.*

> The Act of August 24, 1894 (28 Stat. 502, C. 330), authorized purchasers of the property of Choctaw Coal and Railroad Company to organize a corporation and to confer upon the same all the powers, privileges and franchises vested in that company. Under the Act of Congress of April 24, 1896 (29 Stat. 98, C 122) the appellants became successors of the Choctaw Coal and Railroad Company. *Held;* That appellant was authorized by law to do anything either necessary or convenient to the operation of its railroad or mines. If, therefore, the property acquired under the contract sued on was either necessary or convenient to the operation of the appellant's railroad or mines, the company was authorized to make the contracts and could not defend on the ground that the contract was ultra vires.

Appeal from the United States Court for the Central District of the Indian Territory; before Justice Wm. H. H. Clayton, December 3, 1903.

Action by Robert I. Bond against the Choctaw, Oklahoma & Gulf Railroad Company. From a judgment in favor of plaintiff, defendant appeals. Affirmed.

On November 18, 1902, plaintiff (appellee) filed his complaint in the court at South McAlester, and alleged that on or about February 4, 1902, he entered into a contract with defendant through its agent, J. W. McLoud, by which he sold

to defendant for consideration named certain property in Hartshorne and Gowan, and all buildings and improvements on certain sections of land, and released to said defendant all his rights to the surface of said land for the purpose of constructing and maintaining a reservoir, and so far as plaintiff had the legal right to do so, grant and convey to said company the right to construct dams and impound water on all of said land; agreed to have transferred to defendant a lease between Dave Thomas and J. D. Chastain, both Indian citizens, of date December 11, 1901; and also agreed as follows: "Covenant and agree to cause to be procured a lease for the purpose of a reservoir on all of the described land for a period of thirty years from said Dave Thomas to said Chastain, and to procure the same to be assigned by the said Chastain to the said railroad company; and I covenant and agree to protect said railroad company in the possession of said land until after its said reservoir shall be completed, and to accomplish said end I agree that the sum of $3,500.00 for the property above referred to in the city of Hartshorne and at mine No. 3 may be retained by said company to be paid to me when it shall have completed said reservoir without interruption by any one else, and without there being any adverse title to any of said land" —also to acquire certain improvements from one Boatright for $100. Plaintiff alleges he fully complied with his covenants and agreements in said contract mentioned, and that there is due from defendant to him $3,500, wherefore he sues.

On June 5, 1903, a general demurrer to complaint was overruled, and on June 8, 1903, defendant filed its answer and denied that it ever entered into a contract with plaintiff through its agent, J. W. McLoud, denies that the contract set out in plaintiff's complaint is the contract so entered into, denies that plaintiff ever performed any of the things set out in said contract or alleged to have been performed by plaintiff, denies

INDIAN TERRITORY REPORTS.

plaintiff has fully performed his contract. and denies that there is due plaintiff $3,500. "Further answering herein, defendant says that plaintiff never at any time had any right or title to the premises named in his complaint, and plaintiff says that the title to said lands was never in the plaintiff, and that in order to get possession of the said lands defendant has been compelled to pay out large sums of money to other persons whose right were superior to plaintiff's, and has been compelled to institute condemnation proceedings in order to maintain possession of said property. Defendant further says that the contract alleged in the complaint to have been entered into by McLoud, agent of this defendant, was absolutely void and against public policy, and in violation of the Choctaw law, which prohibits the leasing by an Indian citizen, to a citizen of the United States, Indian lands; and that all the contracts alleged by plaintiff with the defendant in his complaint are without merit and in violation of law, and not binding upon this defendant." On June 22, 1903, on motion of defendant, venue was changed to Poteau. On December 3, 1903, this case came on for trial before a jury, and after the introduction of testimony the defendant filed a motion for peremptory instruction, which was overruled by the court, to which defendant excepted, and then plaintiff filed motion for peremptory instruction, which motion was sustained, to which defendant excepted, and thereupon, under instructions of the court, the jury rendered from the box the following verdict, to wit: "We, the jury, duly impaneled and sworn, find for the plaintiff, Robert I. Bond, in the sum of $3,354.30. · M. N. Ledbetter, Foreman." Defendant filed motion for new trial, which was overruled, to which defendant excepted, and judgment was rendered on the verdict, to which defendant excepted and appealed to this court.

*Stuart & Gordon*, for appellant.

*W. H. Moore* and *E. A. Boyd*, for appellee.

TOWNSEND, J. (after stating the facts). The appellant (defendant) files six specifications of errors, as follows: "(1) The court erred in overruling defendant's motion for a new trial. (2) The court erred in instructing the jury to find for the plaintiff. (3) The court erred in holding that there was sufficient evidence to sustain a verdict for the plaintiff. (4) The court erred in not instructing the jury that the contract between the plaintiff and defendant was contrary to public policy and in violation of law and void. (5) The court erred in not instructing the jury that the defendant railroad company had no power or authority to make a contract such as the one sued on, and that the same was ultra vires and void. (6) The court erred in not instructing the jury to find for the defendant, by reason of the failure of the plaintiff to perform the condition precedent of his contract, and by reason of the breach of plaintiff's covenants for the uninterrupted possession of the said lands"—but discusses them under the head of three propositions. The first proposition is: "Whether, under the contract sued on in this case and the proof, the appellee, Bond, performed the condition and covenants of his contract, and whether therefore the appellant was required, under the terms of the contract, as controlled by the proof, to pay unto plaintiff any portion of the sum of $3,500.00 sued for herein."

It is contended by the appellant that the agreement in the contract, to protect the defendants in the possession of said land until after its said reservoir shall be completed, is a condition precedent to the performance by the appellant of its part of the contract. The language used in the contract is: "To accomplish said end I agree that the sum of $3,500.00 for the property above referred to in the city of Hartshorne

and at 'mine No. 3 may be retained by said company to be paid to me when it shall have completed said reservoir without interruption by any one else, and without there being any adverse title to any of said land." It is therefore perfectly clear that the $3,500 was to be retained by defendant until it shall have completed its reservoir. The $3,500 was for the property in Hartshorne and Gowan, and the contract recites, "for which deeds have been executed on this date." Hence, so far as the sale of the property in Hartshorne and Gowan was concerned, the contract on the part of plaintiff was already executed, but the purchase price was to be retained "to accomplish the end" of having plaintiff execute the balance of the agreement. In Anson on Contracts, p. 182, it is said: "But with respect to statements in a contract descriptive of the subject-matter of it, or of some material incident thereof, the true doctrine, established by principle as well as authority, appears to be, generally speaking, that, if such descriptive statement was intended to be a substantive part of the contract, it is to be regarded as a warranty; that is to say, a condition on the failure or nonperformance of which the other party may, if he is so minded, repudiate the contract in toto, and so be relieved from performing his part of it, provided it has not been partially executed in his favor. If, indeed, he has received the whole or any substantial part of the consideration for the promise on his part, the warranty loses the character of a condition, or, to speak perhaps more properly, ceases to be available as a condition, and becomes a warranty in the narrower sense of the word, viz., a stipulation by way of agreement, for the breach of which a compensation must be sought in damages."

It is perfectly evident that the contract was entered into between the plaintiff and defendant to secure a reservoir site for defendant. The improvements on the land which

plaintiff contracted to sell were not on the right of way of the defendant, and at the time the contract was executed the act of February 28, 1902 (chapter 134, 32 Stat. 43 [U. S. Comp. St. Supp. 1905, p. 370]), had not been passed, which permitted railroads to condemn land for certain purposes outside of their right of way. The plaintiff testified as follows: "Mr. Moore: What statement was made by Mr. McLoud as to these other claims, and as to which claim he would support? A. I took Mr. McLoud in my buggy and went out and went over this dam site, and I showed him all the claims that were there and the fences and all the improvements, and told him the exact situation, and then he notified me to come to Little Rock, and he wrote me letters saying that he would support me in this matter. Q. Did he make any statement as to the claim the company would support? A. Yes, sir. Q. What was that? A. That he would support me in the claim, depend on me to protect them, which I agreed to do." It thus appears that the attorney of the defendant understood fully what the conditions were when he drew the contract, and, as there were other parties beside plaintiff having claims for improvements on this same land, the provision of the contract was inserted that the $3,500 should be retained, and to be paid to plaintiff "when it (defendant) shall have completed said reservoir without interruption by any one else and without there being any adverse title to any of said land."

McLoud testified that the defendant commenced the construction of the dam, and while the work was in progress certain parties notified the defendant to stop work, whereupon McLoud wrote plaintiff two letters, as follows:

"Little Rock, Ark., Feb. 10, 1902, At Hartshorne. R. I. Bond, Care St. Charles Hotel, New Orleans, La.—Dear Sir: I have arranged with my clerk, Mr. McCullough, to get a check

for $365.00 from Mr. Varnall, to send to you, and I will cover it by voucher to him when I get home. Please sign the inclosed receipt and return to me. James Brazill has served notice upon our workmen not to build the dam. He does not claim that he owns the land where the dam is being put, but claims that the building of the dam will cause the water to back up and make part of the reservoir on the land owned by him. He has notified us not to do any clearing for the reservoir, which, of course makes the building of the dam useless to us. I have instructed our men to go ahead with the work unless they are actually stopped by him, and I shall depend upon you to fight out his claim. I went for Dr. Hailey and Jim Elliott today to have them call Brazill off, but we found he had gone to Little Rock, I suppose to see me. I came here from Guthrie and have to return there, and will not get back to Little Rock for several days. If you can instruct Chastain, either in his name or the name of Dave Thomas, to do anything to head Brazill off, I wish you would do it. One Brannon has also notified us that Minnie Brannon an Indian woman, claims the N. E. ¼ of the S. E. ¼ of section 26, and the W. ½ of the N. W. ¼ of the S. W. ¼ of section 25. I shall expect you to protect us against all these claims. I hope that you will have a pleasant trip to Havanna, and that you will get this inclosure before you leave. Yours truly, J. W. McLoud, General Solicitor."

"Little Rock, Ark., Feb. 21, 1902. Dr. R. I. Bond, Hartshorne, I. T.—Dear Sir: As you probably know, I have been hung up with an injunction suit at Guthrie, and just got back from there yesterday, and will have to return again Sunday night, and will probably be up there all next week. If you want to write me there any time next week, do so in care of C. M. Barnes. I will depend upon you to protect us against Jim Brazill and all others. I have instructed our fellows to

keep at work and pay no attention to anything short of court order. I understand a bill which I prepared last fall has just just passed the House and Senate, and, if it has, we can twist their tails all right on this reservoir matter. Yours truly, J. W. McLoud, General Solicitor."

It appears from the testimony of plaintiff that the dam was completed without interruption by any one: "Q. Was the work on that dam ever stopped by any outside party from the time it began until it was completed? A. No, sir; it was not. I passed through there every day in my practice, and the work never stopped on account of anything except rain and natural conditions. Q. Did they ever call on you to protect them in any way? A. No, sir. Q. Was the dam as a matter of fact completed? A. Yes, sir"—and under the terms of the contract the $3,500 became due. If this provision of the contract can be called a condition, it can only be a conditional promise, and, the condition having been performed, the defendant is liable to pay according to the terms of the contract. Lawson on Contracts, § 409: "A promise may be conditional, i. e., where the performance is not due immediately, but becomes so only after the happening of a future event. In such cases the condition precedent must take place before the party can be in default for not performing his promise."

Appellant insists that it was compelled to institute condemnation proceedings to perfect title. When this contract was executed, the act authorizing condemnation proceedings had not been enacted. No titles in fee could be secured, the Indian was not authorized to convey title in fee, and the right to occupancy could alone be conveyed. The plaintiff fully complied with the terms of his contract. After the act of February 28, 1902 (chapter 134, 32 Stat. 43 [U. S. Comp.

St. Supp. 1905, p. 370]), was passed, all those having pretended claims were eliminated by the condemnation proceedings. The effect of this act was euphoniously expressed by the attorney for the defendant in his letter to the plaintiff, as enabling them to "twist their tails all right on this reservoir matter." Having successfully accomplished their purpose, with the assistance of the plaintiff, on other claimants, the effort is now evidently being made to treat the plaintiff likewise.

The second proposition presented by appellant is as follows: "The court erred in not instructing the jury that the contract between the plaintiff and defendant was contrary to public policy, in violation of law, and void." The contract between plaintiff and defendant contained this clause: "I (Bond) further covenant and agree to (cause to) be assigned and transferred to the said railroad company, a lease between one Dave Thomas, an Indian citizen, and one J. D. Chastain, an Indian citizen, of date December 11, 1901." The lease was dated December 11, 1901, and the plaintiff had the same duly assigned. In a letter written by the plaintiff, and directed to J. D. Chastain, at the instance of defendant's attorney, is explained what defendant desired to have done. It is as follows: "Little Rock, Ark., Feb. 4, 1902. J. D. Chastain, Esq., Hartshorne, I. T.—Dear Sir: I have reached settlement with the Choctaw, Oklahoma, & Gulf Railroad Company in regard to the reservoir, and inclose you herewith the original lease between you and Dave Thomas for you to assign and acknowledge the assignment writing on typewriter and attached to the same. I also inclose you another lease drawn up in better form, from Dave Thomas to you, covering 240 acres of land, which please have Dave Thomas sign and acknowledge, and then you sign and acknowledge the assignment on the back of it to the railroad company, and return these to Mr. McLoud, Little Rock, Ark.   *   *   *   Yours truly,

R. I. Bond." In the testimony of Chastain appears the following questions and answers: "Q. Do you remember whether the contract between the railroad and Dr. Bond was inclosed? A. Yes, that was inclosed, and the leases to be signed by Dave Thomas and myself were inclosed. Q. Were the assignments made? A. Yes, sir. 'Q. What was done with them? A. Returned to Mr. McLoud. Q. In accordance with the instructions in the letter? A. Yes, sir." Yet appellants insist that this lease was contrary to the statute and void. But this land had not been allotted under the provisions of the Curtis bill (30 Stat. 495, c. 517), and allotments did not take place until after the supplemental agreement was ratified on September 25, 1902, for the reason that the amount to be allotted to each individual Indian could not be determined; but, under the proviso of section 16 of said act (30 Stat. 501), it was "provided that where any citizen shall be in possession of only such amount of agricultural or grazing land as would be his just and reasonable share of the lands of his nation or tribe and that to which his wife and minor children are entitled, he may continue to use the same or receive the rents thereon until allotment has been made to him." It was therefore entirely proper for Thomas to lease Chastain this land, and the same would be good until allotment took place.

The third proposition discussed by appellant is as follows: "That the agreement or contract alleged to have been made between J. W. McLoud, general solicitor of the Choctaw Railroad, and R. I. Bond, was not authorized by the company through its directors or president, and therefore was not binding upon the company; and, further, that it could not have been authorized by the company because such contract by the company would have been ultra vires and void." Appellant insists that it is not shown

in the evidence that the defendant company ever ratified the contract made by its attorney and Bond, and that no authority is shown by McLoud to make the contract, and quotes section 10 of the act of Congress (25 Stat. 38, c. 13) authorizing the Choctaw Coal & Railway Company to construct its railway through the Indian Territory, showing the conditions upon which its rights were granted, and that, under section 2 of the act (25 Stat. 36), "the said railroad was not authorized to take any land other than a right of way one hundred feet in width, a strip of land two hundred feet by three thousand feet in addition to right of way for stations for every ten miles of road, and the right to use additional ground necessary for heavy cuts and fills, not exceeding one hundred feet in width on each side of the right of way, and providing that no more than said addition of land shall be taken for any one station;" and insists that, if the company had ratified the contract, it would be ultra vires and void.

The first act to authorize the Choctaw Coal & Railway Company to construct and operate a railway through the Indian Territory, and for other purposes, was approved February 18, 1888. 25 Stat. 35, c. 13. This act was amended February 13, 1889 (25 Stat. 668, c. 152), on February 21, 1891 (26 Stat. 765, c. 249), and also on January 22, 1894 (28 Stat. 27, c. 14), and on August 24, 1894 (28 Stat. 502, c. 330), an act was passed as follows: "An act to authorize purchasers of the property and franchises of the Choctaw Coal and Railway Company to organize a corporation and to confer upon the same all the powers, privileges, and franchises vested in that company," section 5 of which is as follows: "That the said corporation, when organized as hereinbefore provided, shall have and possess perpetual succession and shall be able to sue and be sued, plead and be impleaded, in all courts of record and elsewhere, and shall have power to ordain, establish and

put in execution such by-laws and regulations as shall be proper, necessary, or convenient for the government of the said corporation, not being contrary to the Constitution and laws of the United States, and generally to do all and singular the matters and things which shall be necessary or convenient to enable the said company to maintain, use, and operate their railroads and mines which it may become possessed of by virtue hereof in conformity with the provisions of the acts of Congress relating to or affecting the Choctaw Coal and Railway Company." Under an act of Congress approved April 24, 1896 (29 Stat. 98, c. 122), entitled, "An act to amend an act approved August twenty-fourth, eighteen hundred and ninety-four, entitled, 'An act to authorize purchasers of the property and franchises of the Choctaw Coal and Railway Company to organize a corporation and confer upon the same all the powers, privileges, and franchises vested in that Company,'" the appellants became the successors of the Choctaw Coal & Railway Company. It therefore appears that appellant was authorized by law to do anything either necessary or convenient to the operation of its railroad or mines. If, therefore, the property acquired under the contract sued on was either necessary or convenient to the operation of the appellant's railroad or mines, the company was authorized to make the contract.

In 2 Beach on Corporations, par. 427, it is said: "When an act in its external aspect is within the general powers of a company, and is only unauthorized because it is done with a secret unauthorized intent, the defense of ultra vires will not prevail against a stranger who dealt with the company without notice of its intent. That a mining plant bought by a mining company, and adapted to its business, contained some properties that the company buying might not be authorized to purchase, does not avoid the notes given for the plant.

So, if a company properly using land purchase other lands it cannot evade payment by pleading that the purchase was unnecessary for the purposes of the corporation. A lender to a company having power to borrow money need not see to it that it is applied to its legitimate business. The rule as to participation with a corporation in doing an ultra vires act is based upon no different principle than that of participation in 'any illegal contract. And the fact of knowledge of the company's purpose without any fraudulent intent on the part of the person dealing with it will not defeat the latter's action." Beach also says (paragraph 424): "It is now very well settled that a corporation cannot avail itself of the defense of ultra vires when the contract itself has been, in good faith, fully performed by the other party, and the corporation has had the full benefit of the contract." And, in paragraph 426: "If, however, there have been acts of part performance which the company must be taken to have acquiesced in and to have thus adopted the contract, specific performance will be decreed." And, in paragraph 425, he says: "The doctrine of ultra vires as a defense has died so hard that it is well to repeat the proposition, which seems to be fully established by the more recent decisions, that, where a contract has in good faith been fully performed either by the corporation or the other party, the one who thus has received the benefit will not be permitted to resist its enforcement by the plea of mere want of power." In De Groff vs American, etc., Co., 21 N. Y. 124, the court says: "But again, if it be conceded that defendants had no right to enter into the contract of sale in this case and bind 'the company to perform the obligations assumed, viewed as a mere question of corporate power, yet having undertaken to do so, and having received the full consideration agreed to be paid by the plaintiff, and he having fulfilled his entire contract, they cannot now be permitted to set up that excess of authority to excuse them from that part of the contract

which imposes an obligation upon them. It is very clear that, if the plaintiff in this suit had been prosecuted upon one of the notes given by him upon the purchase, he could not, having accepted and retaining the goods, have set up as a defense want of power in the defendants to enter into the contract. The same rule of right and the same measure of justice will be exacted in this suit. This principle has been repeatedly held as applicable to an individual attempting to screen himself from liability when contracting with a corporation, when seeking to escape responsibility on the plea of ultra vires for acts deliberately done with all usual and needful formalities; and, where they have received the entire benefit they contracted for, such a defense should no longer be tolerated in our courts. National Bank vs Whitney, 103 U. S. 99, 26 L. Ed. 443; Diamond Match Co. vs Roeber, 106 N. Y. 473, 73 N. E. 419, 60 Am. Rep. 464; Whitney Arms Co. vs Barlow, 63 N. Y. 62, 70, 20 Am. Rep. 504; Steam Navigation Co. vs Weed, 17 Barb. 378; Leavitt vs Pell, 27 Barb. 322; Standard Oil Co. vs Shofield, 16 Abb. N. C. (N. Y.) 372; Oil Creek, etc., R. Co. vs Pennsylvania Transportation Co., 83 Pa. 160, where in a suit between two corporations it was said: 'We do. not think the defendants are in a position to defend upon the ground of the illegality of the contract. There were mutual covenants and mutual advantages. The defendants had enjoyed the advantages such as they were.' Chicago, etc., Ry. Co. vs Derkes, 103 Ind. 520, 3 N. E. 239; Ehrman vs Union Central, etc., Ins. Co., 35 Ohio St. 324.''

Appellee insists that the cases cited by appellants in Central Transp. Co. vs Pullman Palace Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, and Pennsylvania R. Co. vs St. Louis, A. & T. R. R. Co., 118 U. S. 317, 6 Sup. Ct. 1090, 30 L. R. A. 83, are not applicable, "for the reason that in the

cases cited the corporation attempted to confer on another corporation all of the rights and powers which it had received from the Legislature; in other words, it attempted to place itself in a position where it could not perform the duties which its charter required." Appellee cites the case of Jacksonville M. P. R. & N. Co. vs Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515, to sustain his contention that the defense of ultra vires is not available, and after an examination of the case it appears to fully support his contention. In Hitchcock vs Galveston, 96 U. S. 341, 24 L. Ed. 659, Justice Strong says: "Although there may be a defect of power in a corporation to make a contract, yet, if a contract made by it is not in violation of its charter or any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise and in execution of the contract to expend money and perform his part thereof, the corporation is liable on the contract." To the same effect is Union Gold M. Co. vs Rocky Mountain National Bank, 96 U. S. 640, 24 L. Ed. 648, and Union National Bank vs Mathews, 98 U. S. 621, 25 L. Ed. 188.

It is our judgment that the action of the court below in directing a verdict for the plaintiff was correct, and the judgment of the court is therefore affirmed.

GILL, C. J., and LAWRENCE, J., concur.